# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**EDWARD FREEMAN, JR.,**                    Chapter 7
     Debtor                                    Case No. 12-10050-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion to Avoid Judicial Lien (the "Motion")
pursuant to which Edward Freeman, Jr. (the "Debtor") seeks to avoid judicial liens obtained
by Douglas Grasso ("Grasso").  Through his Motion, the Debtor seeks to avoid Grasso's
judicial liens as impairing his homestead exemption in property located at 34 Arbor Street,
Wenham, Massachusetts (the "property").  Grasso filed an Opposition to the Motion,
asserting that the Debtor's homestead exemption is invalid, and thus his judicial liens do
not impair an exemption to which the Debtor is entitled and cannot be avoided under 11
U.S.C. § 522(f)(1)(A).  Grasso maintains that the Debtor's interest in the property is a
remainder interest because the deed by which the Debtor acquired his interest gives his
sister, Valerie Daniels ("Valerie"), a life estate in the property, and that, under
Massachusetts law, the holder of a remainder interest is not an owner entitled to claim a
homestead.  *See* Mass. Gen. Laws ch. 188, §§ 1 and 3.

The issue presented is whether the Debtor has a valid homestead exemption.  The

validity of the exemption depends upon the interpretation of the Quitclaim Deed, dated

May 13, 2004, pursuant to which the Debtor acquired his interest in the property from his

parents.  If the Debtor's interest does not fall within the pertinent definitions of an "owner"

under Mass. Gen. Laws ch. 188, § 1, then his homestead is invalid under ch. 188, § 3 because

only an "owner" or "owners" may acquire estates of homestead.  If the Debtor is ineligible

for homestead protection, the judicial liens held by Grasso cannot be avoided because they

do not impair a valid homestead for purposes of 11 U.S.C. § 522(f)(1), (2).

## II. PROCEDURAL BACKGROUND

Grasso holds two judicial liens on the property, one in the face amount of $96,969.59

and the other in the amount of $82,802.25. Grasso obtained the judicial liens as a result of

a prejudgment attachment and successful litigation against the Debtor involving the

Debtor's purchase of Grasso's business.  According to Grasso, the Essex Superior Court

issued executions in the amounts of $98,395.55 and $83,650.82, upon which the Essex

County Deputy Sheriff levied on August 4, 2011.  The executions were recorded and,

pursuant to Mass. Gen. Laws ch. 236, § 4, the judicial liens were perfected against the

Debtor's property.  There is also a tax lien on the property in the sum of $50,282.32.

The Debtor scheduled an interest in the property on Schedule A-Real Property

without describing the precise nature of his interest.  On Schedule A, the Debtor indicated

that the property was subject to a "[r]eserved life estate for Valerie Daniels," and that "[i]f

sold during the lifetime of Valerie Daniels, 50% proceeds to Valerie Daniels." He added that

the current value of his interest was $153,300 and that the property was subject to a secured

claim in the amount of $358,236. The Debtor later obtained a broker's price opinion for the

property in the sum of $149,000. On Schedule C-Property Claimed as Exempt, the Debtor

claimed the property as exempt. He elected the Massachusetts exemptions, listing the

current value of the property as $306,000 and claiming $490,000 as the value of his

exemption under Mass. Gen. Laws. ch. 188, § 1. It is undisputed that the Debtor prepared

a Declaration of Homestead which was recorded in the Southern Essex Registry of Deeds

on December 1, 2011.

The Court heard the Motion and Grasso's Opposition on June 26, 2013. At the

conclusion of the hearing, the Court directed Grasso to file a Motion for Summary

Judgment. Grasso complied with the Court's order and filed a Motion for Summary

Judgment, together with a Corrected Concise Statement of Undisputed Material Facts. The

Debtor filed an Opposition and a Cross-Motion for Summary Judgment, which the Court

heard on September 11, 2013. On September 17, 2013, this Court entered the following

order, denying the cross-motions for summary judgment:

> Upon consideration of: (1) the Debtor's Motion to Avoid Judicial Lien; (2) the
> Opposition to the Motion to Avoid Lien filed by Douglas Grasso ("Grasso");
> (3) the Motion of Grasso for Summary Judgment with respect to his
> Opposition to the Motion to Avoid Judicial Lien and the Memorandum,
> Affidavits and Statement of Undisputed Facts filed in support thereof
> through which he asserts that the Debtor's parents, as grantors (the
> "Grantors"), conveyed a life estate to the Debtor's sister and a remainder
> interest to the Debtor in the real property located at 34 Arbor Street,
> Wenham, MA (the "property") pursuant to a deed dated May 19, 2004 (the
> "Deed"); (4) the Debtor's Consolidated Opposition to Grasso's Motion for
> Summary Judgment and Cross Motion for Summary Judgment, the
> Statement of Undisputed Facts, the Affidavit and other documents filed in
> support thereof; (5) the hearing held on September 11, 2013 with respect to
> the Summary Judgment Motions and the arguments advanced by counsel;

3

and (6) the decision of the Supreme Judicial Court of Massachusetts in
Hershman-Tcherepnin v. Tcherepnin, 452 Mass. 77 (2008), the Court finds
that the language of the Deed presents both legal and factual issues which
preclude the entry of summary judgment for either party.

The legal issues include, without limitation, whether the Grantors conveyed
a valid life estate in the property to the Debtor's sister and a valid remainder
interest to the Debtor or whether each owns the property as tenants in
common. The factual issues include, without limitation, the intent of the
Grantors in conveying the property to their children and whether they
intended them to each own a proportionate share of the property.

Following the denial of summary judgment, the Court issued a pretrial order.

Pursuant to that order, the parties filed a Joint Pretrial Memorandum and the Court

conducted an evidentiary hearing on August 19, 2014.

## III. FACTS

The parties agreed to eight pertinent facts, which the Court now paraphrases:

1. On December 1, 2011, Edward Freeman, Jr. caused a Declaration of
Homestead to be recorded for the real property located at 34 Arbor Street,
Wenham, Massachusetts . . . at the Essex South Registry of Deeds, Book
30884, Page 385.

2. Edward Freeman, Jr., filed his voluntary petition for relief under Chapter
13 of the United States Bankruptcy Code on January 4, 2012 ("Petition Date").

3. Edward Freeman, Jr. converted his case to one under Chapter 11 of the
United States Bankruptcy Code on May 2, 2012, and converted his case to
Chapter 7 on February 20, 2013.

4. Edward Freeman, Jr. lived and occupied the Premises at the time of
recording the homestead declaration and at the time of his bankruptcy
petition.[1]

---

[1] As noted, Grasso filed a Motion for Summary Judgment and an Amended
Concise Statement of Material Facts in which he stated that the Debtor recited his
address as 36 Arbor Street, rather than 34 Arbor Street.  Moreover, Grasso stated, on

5. On May 15, 2007, Grasso obtained a pre-judgment attachment against the Debtor from the Essex Superior Court, in the amount of $140,000.00, which was recorded on July 27, 2007 with the Essex South District Registry of Deeds in Book 27058, Page 83.

6. On April 14, 2011, the Essex County Superior Court issued executions against the Debtor in the amounts of $98,395.55 and $83,650.82, respectively.

7. On April 14, 2011, the Essex County Deputy Sheriff levied on the Debtor's real interest in the Premises by recording same in the Essex South District Registry of Deeds. The Executions are recorded in Book 30572, Page 305 and Book 30572, Page 309, respectively.

8. The recorded Executions constitute a judicial lien against Edward Freeman, Jr.'s interest in the Premises relating back to the date of the pre-judgment attachment.

The Quitclaim Deed by which the Debtor obtained his interest in the property provides in pertinent part the following:

We, Edward Freeman a/k/a Edward Freeman, Sr. and Doris G. Freeman, of 34 Arbor Street, Wenham, Massachusetts, with Edward Freemen [sic] a/k/a Edward Freeman, Sr., acting as Attorney in Fact for Doris G. Freeman, under a Durable Power of Attorney . . . being married, for nominal consideration paid, and in full consideration of, grant to Edward Freeman, Jr. of 36 Arbor Street, Wenham, Massachusetts, of said Wenham, 34 Arbor Street, Wenham, Massachusetts, with quitclaim covenants the land with buildings thereon situated on Arbor Street in said Wenham, *subject to a reserved life estate for the benefit of our daughter*, Valerie Daniels of 59 Poplar Street, Danvers, Massachusetts.  If the said Edward Freeman, Jr. should sell the *premises*

---

information and belief, that the Debtor advised taxing authorities that his address was 36 Arbor Street, although at his § 341(a)  meeting, the Debtor stated that the record owner of that property is his grandmother. The Debtor responded by filing his own Motion for Summary Judgment. On September 17, 2013, the Court denied the cross-motions and scheduled a trial.   In the parties' Joint Pretrial Memorandum, they agreed to the following:  "Edward Freeman, Jr. lived and occupied the Premises at the time of recording the homestead declaration and at the time of his bankruptcy petition." Accordingly, the Court finds that Grasso waived any objection to the Debtor's homestead  with respect to 34 Arbor Street based upon lack of residency.

5

during my daughter's lifetime, my daughter shall receive on-half (½) of the proceeds of the sale . . .

(emphasis added).

At the trial five witnesses testified.  The first witness was Attorney Ann Francis ("Attorney Francis"), who drafted the Quitclaim Deed.  She testified that Edward Freeman, Sr. ("Mr. Freeman") met with her on February 11, 2004 concerning his estate planning for the benefit of his family.  She stated:

> Mr. Freeman was very concerned for his daughter, Valerie. At the time she was living in a different place. He wanted to make sure that if she ever needed a place to live during her lifetime that she would have Arbor Street to go back to. He was also -- wanted to make sure that his son, Edward, Jr. –
> . . . could continue to live in the home and run the family business, which is located right next door.

Attorney Francis indicated that Mr. Freeman did not seek to impose any obligations on Valerie, stating "he never intended for her to pay any expenses for the house, taxes, maintenance."  According to Attorney Francis, Mr. Freeman knew that the Debtor was going to reside in the property and he wished for "just a safety net for Valerie in case she needed somewhere to go."  Attorney Francis testified that Mr. Freeman  also wanted to insure that Valerie would get one-half the proceeds if the property were sold.  Attorney Francis testified that Mr. Freeman did not want the Debtor to be able to sell the property without giving some money to Valerie.  She added that his intent "was always for Ed, Jr., to have the property" and that "if Valerie were to die before him, he would take the property and have the right to all the proceeds." In addition, he wanted the Debtor to be able to live in the family home and run the family business located next door.

6

Attorney Francis was asked about her experience in drafting deeds with life estate interests.  Specifically, she was asked whether she would have worded a "true" life estate differently than the manner in which she set forth Mr. Freeman's intentions in the Quitclaim Deed with respect to Valerie.  She answered:  "I think so. I would have sort of reversed the wording and made it clearer."

Attorney Francis indicated that, although Mr. Freeman wanted a safety net for Valerie, he did not envision her living at 34 Arbor Street except in the case of an emergency, adding that he never intended for Valerie to pay any expenses associated with the property. She reiterated that Mr. Freeman wanted ownership of 34 Arbor Street to go to the Debtor and did not impose any obligations on Valerie. In her words, "[h]e did not anticipate her having a right to throw Ed out of the house.  He envisioned that if she ever had to move, she'd move in there with her brother for however long she needed."  She repeated that if Valerie were to predecease the Debtor, he would obtain full ownership rights in the property and have the right to all the proceeds.

Attorney Francis indicated that Mr. Freeman did not express a real understanding of a "life estate."  She testified that he was just looking for a quick way to give some protection for his daughter.  She stated that he was a very simple man who did not want to discuss legal complications.

Valerie Daniels, the Debtor's sister, also testified.  She indicated that she took care of her mother and father as a certified care giver.  She testified that she was living near them at the time the Quitclaim Deed was executed in an apartment complex she identified

7

as Beverly Commons.  Valerie  considers her bother, the Debtor, to be the owner of the property and conveyed that understanding to her father.  Valerie testified that her parents purchased a house for her at 13 Andover Road, Beverly, Massachusetts shortly after she expressed her belief to her father that her brother was the owner of 34 Arbor Street.  She indicated that she has not paid taxes on Arbor Street or contributed to its maintenance.  In addition, Valerie testified that she has had discussions with her brother about the Quitclaim Deed, adding that she has not taken steps to sell the property because "[i]t's not mine to sell."  Valerie, who is 69 years old, admitted that she was not present when her father consulted with Attorney Francis and that she has no legal training.

The Debtor, in his testimony, represented that he pays the real estate taxes and maintains the property.  He indicated that he paid those expenses while his father was alive.  He also testified that he executed a homestead on December 1, 2011 and that the appraisal he obtained resulted in a valuation of between $139,000 and $149,000.

The Debtor testified that he is a used car dealer and operates his business from 34 Arbor Street in Wenham.  The business was established in 1938 by his father, who  passed away in June of 2013.  He began working in the business in 1972.  The Debtor testified that his father wanted him to continue the business and to live at 34 Arbor Street, adding that, if the property were sold, his father wanted Valerie to get one-half of the proceeds.

In addition to paying real estate taxes at 34 Arbor Street, the Debtor pays taxes with respect to an adjacent parcel located at 36 Arbor Street, which is owned by his grandmother.  He testified that he started paying taxes on 36 Arbor Street after his father

8

died.

The final two witnesses were expert witnesses. The Debtor called Jonathan Levin, Esq. ("Attorney Levin"), while Grasso called Bruce Miller, Esq. ("Attorney Miller"). Both attorneys are well-qualified to provide expert testimony on the subject of interests in real estate.

Attorney Levin, who has practiced law for 34 years, specializing in residential and commercial real estate, as well as estate planning, testified that he routinely drafts deeds and reviews titles. He opined that the Quitclaim Deed is ambiguous and imprecise. He interpreted the deed to grant a fee simple interest to the Debtor for the following reason:

> I formulate that opinion because the document speaks for itself. It states that the -- it's granting to Edward Freeman the property described as 34 Arbor Street, Wenham, Massachusetts, with quitclaim covenants.

He described the interest obtained by Valerie through this deed as follows:

> I think that that's the major ambiguity in the document, the major imprecision of the document. It refers to "subject to a reserve life estate for the benefit of our daughter." That's an unusual construct of language in a deed subject to liens that it's -- and typically means that it's something that's already existing. For example, when you have a document that says "subject to a prior mortgage," it means that there's a prior mortgage. Here is [sic] says, "subject to a reserve life estate," which would imply that there was an already existing life estate, but we know from the record that there is no prior existing life estate.

Attorney Levin added: "[t]ypically a grant of a life estate would be A for the life of B, with remainder to C. That is not the circumstance in this document." In addition, he stated: "[m]ore commonly you would see language with respect to the maintenance of the property, payment of expenses, which are all obligations of a holder of a life estate. None

9

of that language exists here."

Attorney Levin also observed that the testimony of Attorney Francis, Valerie and the Debtor was consistent with his interpretation of the deed, namely that no life estate was established and that the Debtor is the sole owner.  He also observed that there were no restrictions on the Debtor's ability to sell the property and that, if he had a mere remainder interest, there would be an anomaly because he was granted the right to "sell the premises."

Attorney Levin recognized that there were cases that support the view that, where there are inconsistencies in a deed and imprecision in the language employed, it is appropriate to consider the intent of the grantor.  In analyzing that intent, he testified that it was proper to look at "the various pieces of the so-called life estate puzzle," including who is responsible for payment of property taxes and the maintenance of the property; who is living in the property at the time; and who has rights to live in the property at the time.

Attorney Levin noted that Valerie had not lived in the property for many, many years prior to the conveyance to the Debtor and never lived in the property after the conveyance.  He also observed that neither she nor the Debtor expected that she would live in the property except in the event of an emergency.  He also noted that there was no specific language identifying a remainderman.  He pointed to those circumstances to support the conclusion that he had reached.

Attorney Levin conceded that there is no requirement that the four corners of a deed

10

must define duties incident to a life estate such as the maintenance and upkeep of property, and that there also is no requirement that a life estate has to be given after the initial granting language. Attorney Levin pointed to the absence of granting language, noting the phrase "subject to a reserved life estate" contains no granting language.

Attorney Levin concluded that because of the language that says "during my daughter's lifetime," he would not consider Valerie to be a tenant in common or a joint tenant with the Debtor because upon her death she would no longer have any rights to the property or proceeds.   Accordingly, he conceived of trust-like duties imposed on the Debtor with respect to one-half of the proceeds from any sale of the property.  Thus, in his view, if the Debtor predeceased Valerie, she may have had a tenancy at will right, stating "[s]he may have the right to occupy the premises on some tenancy arrangement, but not as a life tenant."

Attorney Miller testified that he has many years of real estate experience, that he is a member of the Real Estate Bar Association ("REBA"), and that he routinely issues title policies and has done so for approximately twenty-five years.  Based upon his years of experience, he opined: "I think he [the Debtor] holds bare-naked legal title to the property, subject to a reserved life estate for the benefit of Valerie." Attorney Miller added: "I believe that should the property be sold, that Valerie would be entitled to half the proceeds, just as the plain language of the document recites." He stated:

> Well, I believe she basically has the beneficial interest in the property. She has
> the remainder interest. Mr. Freeman has bare title. Certainly no one can
> contest that title is in his name, but it's all subject to her property right, her
> real estate right, which is the life estate where she can stay there for the

11

remainder of her life. Whether or not she lives there or not, she has that right."

Attorney Miller insisted that Valerie had "the right to possession" - - "a present interest." In his view, she is entitled to allow her brother to stay at the property, and, if the Debtor were to exercise the power of sale,

> [b]ased upon the plain language in the document, looking at it, she would be entitled to half the proceeds, but she still would retain the life estate. So if he conveyed the property it would be subject to the life estate, since a life estate is by definition a life estate.

In other words, Attorney Miller concluded that, although the Debtor could sell his future interest, a buyer of the Debtor's interest, would have to wait until Valerie died before taking possession of the property.

Noting the absence of any applicable REBA standard, Attorney Miller testified that, if he represented a buyer of this property, he would advise against accepting a deed signed only by the Debtor. He stated; "I don't believe any title insurance company would insure it either without something from her," such as a relinquishment or waiver of her life estate. He disagreed with Attorney Levin's conclusion that the Debtor owned the property outright. He concluded:

> I believe the language in the deed is clear, though not as artfully drafted as one might like, but the intention is quite clear.
>
> ***
>
> Well, I would say in this case since it's clear to me anyways that a -- that she has the life estate, that the only thing that's left would be the remainder interest. I don't think it has to be stated, but it's just putting a puzzle together. There's nothing left.

He also concluded that Valerie's affidavit filed in this case was insufficient to relinquish her

12

interest, stating: "I wouldn't take a layman's affidavit stating that she thinks her brother has the right to sell the property. That's a legal question."

## IV. POSITIONS OF THE PARTIES

### A. <u>The Debtor</u>

In support of consideration of the grantor's intent, the Debtor cites <u>Bessey v. Ollman</u>, 242 Mass. 89, 136 N.E. 176 (1922), in which the court stated: "[e]very deed is to be construed so as to give effect to the intent of the parties as manifested by the words used, interpreted in the light of the material circumstances and pertinent facts known to them at the time it was executed." <u>Id.</u> at 91. The Debtor adds with reference to <u>Morse v. Kraft</u>, 466 Mass. 92, 98, 922 N.E.2d 1021,1026 (2013), that where a deed is ambiguous or poorly drafted, the settlor's intent, which is paramount, may be adduced through consideration of the material circumstances, including the relationship of the parties, facts known to them at the time, and their course of conduct. The Debtor argues that the deed is ambiguous on its face because of its conflicting provisions and, thus, is susceptible to multiple interpretations. He adds that evidence of the material circumstances resolves the ambiguity so as to allow this Court to construe the deed consistent with Mr. Freeman's intent to convey the property to the Debtor. He points to the evidence that, at the time the deed was executed, the Debtor lived at the property, while Valerie did not; and that Mr. Freeman wished to have the Debtor continue operating the family business located at the property, as well as maintaining the property during his lifetime. The Debtor also points to evidence that Mr. Freeman did not want to burden Valerie with incidence of ownership of the

13

property and bought her a separate property for her sole benefit, noting that according to

the court in <u>Ellis v. Wingate</u>, 338 Mass. 481, 485, 155 N.E. 783 (1959), evidence of subsequent

use of land may help to explain a deed. The Debtor adds that even if the deed were to be

determined to be unambiguous, it could be reformed, citing <u>Franz v. Franz</u>, 308 Mass. 262,

266, 32 N.E.2d 205, 208 (1941).

In support of his argument that the deed can be reformed to effectuate the intent of

the grantor, the Debtor cites, among other cases, <u>Reder v. Kuss</u>, 351 Mass. 15, 217 N.E.2d

904 (1996) (affirming trial court's findings that two non-English speaking uneducated

immigrants had made mutual mistake by placing title to property they purchased together

in their names as tenants in common when they intended to establish right of survivorship).

He relies upon Attorney Francis's testimony that Mr. Freeman did not understand the

ramifications of the term, "life estate," and Levin's testimony that the phrase, "subject to

a reserved life estate," is typically used when there is a pre-existing interest, thus justifying

reformation.

The Debtor argues that "the purpose of the conveyance was not to provide a true life

estate to Valerie, because Mr. Freeman and Debtor discussed the possibility of the Debtor

selling the Property during Valerie's lifetime," adding that there was insufficient evidence

of Mr. Freeman's intent to convey a life estate to Valerie. The Debtor relies upon

<u>Hershman-Tcherepnin v. Tcherepnin</u>, 452 Mass. 77, 891 N.E.2d 194 (2008), a case in which

the court considered whether an ambiguous conveyance created a life estate or a right of

occupancy. According to the Debtor, the court reasoned that the lack of language regarding

14

maintenance, as well as the lack of typical remainder language, demonstrated the intent that the grantee receive a right of occupancy instead of a true life estate, id. at 88-89, distinguishing Braunstein v. Hajjar (In re Hajjar), 385 B.R. 483 (Bankr. D. Mass. 2008), a case in which this Court interpreted the language of a deed and ruled that the debtor granted a life estate to his sister.  The Debtor emphasizes that his power to sell the property is inconsistent with an intent to provide Valerie with a true life estate, and Valerie testified that she does not own, live in, or maintain the property.  In addition, the Debtor maintains that common law rules of construction, including "presume testator acted rationally; construe will practically; avoid absurdity; seek to uphold validity or effectiveness of will; harmonize repugnant, conflicting, inconsistent provisions; give effect to all parts of will; follow ejusdem generis rule," compel the conclusion that the Deed conveyed a fee simple interest to the Debtor, while providing Valerie with a right to one-half of the sale proceeds. The Debtor concludes that "such a result is consistent with Mass. Gen. Laws ch. 183, § 13, and also avoids and harmonizes the potentially absurd or repugnant alternative wherein the Debtor received a present power of sale over property in which he held only a future remainder interest.

The Debtor concludes that he held a valid homestead at the commencement of his case because he was an "owner," defined as "a natural person who is a sole owner, joint tenant, tenant by the entirety, tenant in common, life estate holder or holder of a beneficial interest in a trust." *See* Mass. Gen. Laws ch. 188, § 1.  The Debtor rejects the contention that he is a remainderman without statutory authority to obtain homestead protection,

15

distinguishing <u>In re Bertone</u>, 486 B.R. 5 (Bankr. D. Mass. 2013), and <u>In re Gordon</u>, 479 B.R.

9 (Bankr. D. Mass. 2012), *aff'd*, 487 B.R. 600 (B.A.P. 1st Cir. 2013). Given his right to sell the

property, his obligation to pay taxes and maintain it, and the liberal policy favoring

homestead protection, the Debtor urges the Court to find he has a valid homestead and is

entitled to avoid Grasso's judicial liens.

B. <u>The Judicial Lien Creditor</u>

At the outset, Grasso observes that there are no statutes, court decisions, or REBA

standards which specify where, in the language of the deed, a life estate must be created

(i.e., whether the life estate must be established, before or after the deed grants the

remainder interest to a specified person/entity; and that there are no statutes, court

decisions, or REBA standards that require a grantor to specify in the deed who is

responsible for the maintenance, upkeep or payment of real estate taxes during a life estate

granted therein.

Grasso relies on Attorney Miller's testimony that "if the Debtor decides to sell the

premises prior to Valerie's death, the sale is subject to the following: 1) Valerie Daniels' life

estate; and 2) Valerie Daniels receiving half of the proceeds of the sale for the premises."

In addition, he notes that his expert is authorized to issue title policies on behalf of title

insurance companies and that "no title insurance company would issue a title policy in

connection with the transfer of the Premises, without requiring that Valerie Daniels sign

the deed in which she waives her life estate in the Premises."

Grasso asserts that the Debtor, as a remainderman, is not an "owner" of the property

16

as defined in Mass. Gen. Laws ch. 188, § 1 because the deed conveying 34 Arbor Street divided the estate into a "life estate" in favor of Valerie and left the remainder interest to the Debtor - - two interests created at the same time and by the same instrument.  He notes that in two bankruptcy cases, courts have held that remaindermen are not owners entitled to homestead protection.  See In re Bertone, 486 B.R. 5 (Bankr. D. Mass. 2013), and In re Gordon, 479 B.R. 9 (Bankr. D. Mass. 2012), aff'd, 487 B.R. 600 (B.A.P. 1st Cir. 2013).

Grasso argues that the decision in Bernat v. Kivior, 22 Mass. App. Ct. 957, 494 N.E.2d 425 (1986), a decision in which the court denied a petition to partition property due to the existence of a life estate, supports his position. In Bernat, the court framed the issue as follows with reference to the deed:

> Whatever interest Helen [Kivior] has, she acquired under a deed dated May 10, 1963, from Walter Kivior. We proceed to analyze that instrument. Harrison v. Marcus, 396 Mass. 424, 428, 486 N.E.2d 710 (1985). The deed conveyed 207 acres and a dilapidated residence to Alice E. Hadala, Frances Varno, Celia L. Bernat, and Mildred D. Lagowski as joint tenants. Following a metes and bounds description of the property, record references, and statement that the consideration was less than $100, the deed contained the following one-sentence paragraph:
>
> > "Said premises are conveyed subject to the rights of Helen V. Kivior to occupy the granted premises for the rest of her life."

22 Mass. App. Ct. at 957–58, 494 N.E.2d 425 (footnote omitted).  The court in Bernat began its analysis by observing that the deed was inartfully drafted but determined that "the reservation of 'rights . . . to occupy the granted premises for the rest of her life' conferred a life estate." Id. (citing Thayer v. Shorey, 287 Mass. 76, 78, 191 N.E. 435 (1934), and Langlois v. Langlois, 326 Mass. 85, 86–87, 93 N.E.2d 264 (1950)).

17

Based upon the language of the deed from Mr. Freeman to the Debtor, "subject to a reserved life estate for the benefit of our daughter," Grasso argues that "no further inquiry by this Court is necessary or appropriate." He adds that the Supreme Judicial Court in <u>Hershman-Tcherepnin v. Tcherepnin</u>, 452 Mass. 77, 87-88, 891 N.E.2d 194 (2008), determined that a court should review a deed to determine if the grantor specified who is required to maintain, insure, or pay real estate taxes on the premises, only if the typical language used in creating a life estate is missing from a deed. Because in Grasso's view, the deed unambiguously granted Valerie a life estate, consideration of whether she was required to maintain the property is irrelevant. He also asserts that liberal construction of the homestead exemption set forth in <u>Dwyer v. Cempellin</u>, 424 Mass. 26, 30, 673 N.E.2d 863 (1996), is inapplicable, because the statute itself does not provide homestead protection to remaindermen, relying by analogy on <u>Boyle v. Weiss</u>, 461 Mass. 519, 962 N.E.2d 169 (2012)(under prior version of Homestead Act, debtor who was beneficiary of a trust which held title to property in which she resided could not validly claim a homestead exemption).

Grasso also argues that the Debtor's power to sell set forth in the deed does not transform his interest to a fee simple, insisting that his only interest, a remainder interest, is excluded from homestead protection. Relying upon Mass. Gen. Laws ch. 184, § 2, and <u>Swett v. Thompson</u>, 149 Mass. 302, 3003-04 (1889) he states: "[i]t is well-established that all remaindermen have the right to sell their interest in the real estate subject to the existing life estate." Grasso asserts that "the 'power of sale' clause is separate and independent from the grant of the life estate to Valerie Daniels and the grant of the remainder interest to the

18

Debtor, both of which are contained in the prior sentence," adding that "the deed must be interpreted in accordance with the natural meaning of all words used in the light of the circumstances existing at that time."  He concludes that the provision of the deed providing, "should [the Debtor] sell the premises during my daughter's lifetime, my daughter shall receive one-half of the proceeds of the sale," must be construed as a limitation on the Debtor's rights only, meaning that he would be required to divide the proceeds of the sale of his remainder interest with his sister.

## V. DISCUSSION

### A. Applicable Law

A debtor's claim of an exemption in real estate is governed by state or local law that is applicable on the date of the filing of the petition. *See* 11 U.S.C. § 522(b)(2)(A).  Pursuant to Fed. R. Bankr. P. 4003(c), the burden of proving that an exemption is not properly claimed is on the party objecting to the claimed exemption. *See* In re Edwards, 281 B.R. 439, 447 (Bankr. D. Mass. 2002) ("[T]he burden is on the objecting party to establish that the debtor either failed to create a valid estate of homestead, or, if such estate was created, that it no longer existed at the time of the filing of the bankruptcy case.").  Thus, the burden was on Grasso to prove that the Debtor was not an owner of 34 Arbor Street within the meaning of Mass. Gen. Laws ch. 188, § 1, as remaindermen are not owners entitled to homestead protection.  *See* In re Gordon, 479 B.R. 9 (Bankr. D. Mass. 2012), *aff'd*, 487 B.R. 600 (B.A.P. 1st Cir. 2012); In re Bertone, 486 B.R. 5 (Bankr. D. Mass. 2013).

The principles applicable to the interpretation of deeds are well-settled.  In Town of

19

<u>Wales v. R. Tetreault Land Clearing, Inc.</u>, 67 Mass. App. Ct. 1120, 859 N.E.2d 457 (2006)

(Table), the court observed:

> A deed must be construed so "as to give effect to the intent of the parties"
> unless that is inconsistent with law or "repugnant to the terms of the grant."
> *See* <u>Harrison v. Marcus</u>, 396 Mass. 424, 429 (1985). A deed's meaning,
> "derived from the presumed intent of the grantor, is to be ascertained from
> the words used in the written instrument, construed when necessary in the
> light of the attendant circumstances." <u>Sheftel v. Lebel</u>, 44 Mass. App. Ct. 175,
> 179 (1998).
>
> Where a deed appears clear on its face but fails to reflect the intent of the
> parties, it may be reformed if innocent third parties have not relied upon the
> mistake. *See* <u>Franz v. Franz</u>, 308 Mass. 262, 266 (1941).

<u>Town of Wales</u>, 67 Mass. App. Ct. at *3.

In <u>Monteith v. Michaels</u>, 77 Mass. App. Ct. 1118, 932 N.E.2d 312 (Table), the court

referenced the typical language creating a life estate:  "[t]ypically, 'a conveyance "to B

during his life" or "to B until his death" or other similar words of limitation will create a

life estate in B." <u>Id.</u> at *2 (quoting <u>Hershman-Tcherepnin</u>, 452 Mass. 77. 87-88, 891 N.E.2d

194 (2008), and Alperin & Shubow, *Summary of Basic Law* § 17.15, at 584 (3d ed. 1996)).

B. <u>Analysis</u>

In the deed executed by Mr. Freeman and his spouse, the typical language to create

a life estate was not used.  Thus, this Court must first determine whether the deed is clear

on its face, as Attorney Miller contended, or whether it is ambiguous, and, if an ambiguity

exists, what Mr. Freeman's intention was when he executed the deed for himself and on

behalf of his spouse as her attorney-in-fact. In this regard, the Court is unpersuaded by

Attorney Miller's testimony that the Quitclaim Deed, though inartfully drafted, is

20

unambiguous.

This Court concludes that the language used in the deed was imprecise and ambiguous. This conclusion is supported by Attorney Francis's testimony and concession that she could have made her client's intent more clear. Accordingly, extrinsic evidence is admissible to determine the grantors' intent which is paramount. *See* Morse v. Kraft, 466 Mass. 92, 98, 922 N.E.2d 1021 (2013); Sheftel v. Lebel, 44 Mass. App. Ct. 175, 179, 689 N.E.2d 500, 502-03 (1998) ("The basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances.").

As Grasso recognizes, Attorney Francis and Mr. Freeman spent less than an hour and a half together. Attorney Francis, in drafting the deed, did not employ the typical language used in conveying a life estate. Rather, she drafted a deed in which Mr. and Mrs. Freeman granted the property to their son "subject to a reserved life estate" for Valerie, an intimation that such an estate already existed. In addition, they granted the Debtor the power to sell *the premises*, not simply a remainder interest. In Bernat v. Kivior, 22 Mass. App. Ct. 957, 494 N.E.2d 425 (1986), the court, in construing a life estate, observed:

> Here the right of Helen to occupy the premises deferred the possessory interest of her siblings. This follows because the right to use inherent in a life estate is itself-unless the governing instrument otherwise states-an exclusive possessory interest. 1 *American Law of Property* § 2.16 (Casner ed. 1952). *Restatement of Property* § 7, §§ 107-108, § 117 (1936). *The holder of a remainder interest only may not maintain partition proceedings*. Allen v. Libbey, 140 Mass. 82, 83, 2 N.E. 791 (1885). Watson v. Watson, 150 Mass. 84, 85, 22 N.E. 438 (1889). 2 Newhall, *Settlement of Estates & Fiduciary Law in Massachusetts* § 303

n. 3, at 317 (4th ed. 1958). Schnelby, *Power of Life Tenant or Remainderman to Extinguish Other Interests by Judicial Process*, 42 Harv.L.Rev. 30, 46 (1928).

22 Mass. App. Ct. at 957, 494 N.E.2d at 426 (emphasis supplied).  The deed did not expressly grant Valerie a life estate, and it did not impose any obligations upon her to keep or maintain the property.  Mr. Freeman's intention was to provide Valerie with a "safety-net."  Most telling though is the power he granted the Debtor to sell the property.  The power of sale, like the ability to maintain a partition proceeding, is wholly inconsistent with the right of use inherent in a life estate. Id.

Attorney Francis testified unequivocally that Mr. Freeman's intent was always for the Debtor to have the property, and Mr. Freeman never expressed an understanding of the term life estate, as "[h]e was just looking for a sort of quick way to give some protection to his daughter."  Consistent with his intention to provide for Valerie, after execution of the deed in May of 2004, Mr. Freeman began looking for a house for his daughter and eventually purchased a home for her located at 13 Andover Road in Beverly, Massachusetts.  Thus, Mr. Freeman's subsequent conduct in purchasing a home for Valerie is inconsistent with providing her with a life estate and inconsistent with the provision in the deed granting  the Debtor the power to sell the property, rather than just a remainder interest.  *See* Ellis v. Wingate, 33 Mass. 481, 485, 155 N.E. 783 (1959) ("Because the deed was ambiguous in effect he could have reference to relevant extrinsic evidence bearing upon this intent, such as the circumstances with respect to the ownership of adjacent parcels, the contents of other instruments in the chain of title, and the subsequent action of the parties.").

Attorney Francis explained that Mr. Freeman wanted to establish a safety-net for Valerie.  Granting her the right to reside in the property, if needed, and requiring the Debtor to share the proceeds from a sale of the property were the means to effectuate that intention.

In Hershman–Tcherepnin v. Tcherepnin,, 452 Mass. 77, 891 N.E.2d 194 (2008), the court reviewed a judgment entered by the Probate and Family Court declaring that a testator, Ivan Tcherepnin, through his will, "devised his home as follows: a life estate to his wife, Sue–Ellen Hershman–Tcherepnin (wife), and a one-fifth future interest in remainder to her and each of his four children by an earlier marriage." Id. at 77-78.  The Appeals Court had reversed that judgment, concluding that the will did not give the wife a life estate. *See* Hershman–Tcherepnin v. Tcherepnin, 70 Mass. App. Ct. 218, 873 N.E.2d 771 (2007).  The Supreme Judicial Court concluded that the testator devised to the wife and each child a one-fifth present, possessory interest in the home as tenants in common, and granted the wife a right against partition. It also concluded that the wife's filing of a petition for partition terminated her protection against partition.  Id. at 78.  Before reaching that conclusion, it noted the following:

> Although it is clear that the testator granted the wife and each of his four children a one-fifth ownership interest in the house, it is not clear whether those interests are present estates or future (remainder) estates, in light of the additional grant to the wife of the "right to remain there for as long as she desires." That language creates an ambiguity because it is susceptible to two meanings: a life estate or a mere right of occupancy (a right or privilege not to be removed from the house). Put another way, the phrase leaves some doubt about the property bequeathed, i.e., the quantum of the estate given to the wife.

452 Mass. at 86-87, 891 N.E.2d at 202.   The court determined that "the wife was given

something more than the children by the inclusion of the 'right to remain' language:  not

an additional estate in the property, but special protection against being removed from the

home by partition, as the children concede."   Id. at 87.   The court reasoned as follows:

> [T]he testator did not give or grant the premises—i.e., the entire house—to
> the wife for so long as she desired to live there; he gave her only one-fifth of
> the house and the right to remain there for as long as she desired. Nor did he
> require, through his will, that the wife maintain the property or pay taxes or
> insurance on it. That the wife voluntarily assumed those duties in 2000 does
> not change the fact that the will did not require her to do so, and it is the
> testator's intent as reflected in the will that controls. Compare Wilmarth v.
> Bridges, 113 Mass. 407, 408, 410 (1873) (daughter received life estate where
> testator gave her "the use and improvement of all my real estate . . . so long
> as she chooses personally to occupy and improve the same; on condition of
> her keeping the building in repair and paying the taxes and costs of
> insurance"), with Hesseltine v. Partridge, 236 Mass. 77, 79, 81, 127 N.E. 429
> (1920) (where will granted widow "the use and occupation" of house "so
> long as she shall desire to reside therein," but devised ownership of house to
> testator's daughters, widow did not receive life estate; daughter's ownership
> of house was "subject to the personal right of the widow to use and occupy
> it"; widow's "privilege of the use of this property as a residence was an
> interest in real estate of an unascertained, and probably indeterminate,
> value"). The indicia of a life estate that might make up for the absence of the
> use of traditional language to create such an estate are missing here.
>
> Another reason that we conclude that the will did not create a life estate and
> five remainder interests is the absence of remainder language. Ordinarily, a
> future estate is created by language such as: " 'to B for life, remainder to C
> and his heirs'—B has a present life estate, and C has a remainder in fee
> simple." Alperin & Shubow, supra at § 17.25, at 595. Another example is: "to
> B for life, then to C and his heirs." Id. at 596. See Wilmarth v. Bridges, supra
> at 408, 410–411 (remainder created where property devised to daughter for
> "so long as she chooses to" occupy it, and "whenever [she] shall cease [to do
> so], that the whole shall be divided among my children"). Here, no such
> comparable language was used.
>
> Moreover, to read the will to grant the wife a life estate would be to give her
> a disproportionate share of the house—a one-fifth interest plus a life estate.

24

Id. at 88-89.

The reasoning of the court in Tcherepnin, applies with force in the instant case.  Mr. and Mrs. Freeman did not expressly *grant* a life estate to Valerie.  The language used in the deed contained no granting language in favor of Valerie, merely providing that the deed to the Debtor was "subject to a reserved life estate."  The absence of granting language, coupled with the Debtor's right to sell the *premises,* not merely a remainder interest, creates ambiguity and also undermines the notion that a life estate, as that term is legally defined, was intended.

In the present case, the Court is persuaded by Attorney Levin's testimony.  The Court finds it is significant that Mr. Freeman, rather than providing in the deed that Valerie would be responsible for the  maintenance of the property and the payment of taxes and insurance, almost immediately after executing the Quitclaim Deed purchased a home for her that would require her to expend her resources to maintain and to pay the taxes and insurance incident to that ownership interest. That is strong evidence that there was no intention to provide Valerie with a life estate and concomitant control over and responsibility for the property.  This is particularly so in view of the authority Mr. Freeman granted to the Debtor to sell the premises, not just a limited interest in it.  Moreover, given the size of the elder Mr. Freemans' estate, it would appear inequitable to provide Valerie with a home which she owned in fee simple, a life estate in the property, and one-half the proceeds from the sale of the property, while granting the Debtor a remainder interest in the property and one-half the proceeds in the event he sold it.  *See* Mass. Gen. Laws ch. 183,

25

§ 13 ("A deed or reservation of real estate shall be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed"). The instant case is not similar to, and is distinguishable from, <u>Braunstein v. Hajjar (In re Hajjar)</u>, 385 B.R. 482 (Bankr. D. Mass. 2008). There the intent was to create a life estate in favor of the debtor's sister was clear, particularly where she was obligated to pay the expenses associated with the property. In the present case, the language of the deed and the intent of the grantor compel the conclusion that the Debtor's sister does not have a life estate and the Debtor is not a remainderman.

## VI. CONCLUSION

In view of the foregoing, the Court finds that the Debtor does not hold a mere remainder interest and is entitled to claim a homestead exemption as an "owner" within the meaning of Mass. Gen. Laws ch. 188, §§ 1 and 3(a). As the nature of the Debtor's ownership interest was the sole issue, the Court shall enter an order granting the Debtor's Motion to Avoid the Judicial Lien.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: October 27, 2014